UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/23/2022
```

-------------------------------------------------------------------X
                                      :

TECHNOLOGY INSURANCE COMPANY, INC., *as*   :
*reinsurer and successor to Tower Insurance Company of*  :
*New York*,                                       :
                                       :          21-cv-7387 (LJL)
                      Plaintiff,        :
                                       :      OPINION AND ORDER
         -v-                    :
                                       :

PHILADELPHIA INDEMNITY INSURANCE    :
COMPANY,                                   :
                                       :
                    Defendant.     :
                                       :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Technology Insurance Company, Inc. ("Technology") alleges that defendant Philadelphia Indemnity Insurance Company ("PIIC") breached its duty to defend Hinde Development LLC ("Hinde") in an action captioned *Edwin Ramos v. Hinde Development LLC, et al.*, Index No. 25584/2015e (the "Underlying Action") as an additional insured under an insurance policy issued by PIIC to the Puerto Rican Family Institute, Inc. ("PRFI").  It seeks a declaratory judgment finding PIIC in breach of the duties to defend and to indemnify and declaring that Hinde's coverage under the PIIC Policy is primary to its coverage under an insurance policy issued by Tower Insurance Company of New York (the "Tower Policy").  It also seeks an award of the costs incurred to defend and indemnify Hinde in the Underlying Action in the amount of $121,278.70 plus interest.

On June 6, 2022, the Court granted the parties' joint motion for the bench to try this matter on the papers inclusive of issues of fact, if any, and in lieu of conducting a bench trial in person.  Dkt. Nos. 69–70.  The Court heard oral argument on November 17, 2022.  Dkt. No. 73.

This seemingly simple case raises a number of complex issues.  This opinion constitutes the

Court's findings of fact and conclusions of law.  To the extent any statement labeled as a finding

of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

## BACKGROUND

The following facts are drawn from the parties' statements submitted pursuant to Rule 56

of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the Southern District

of New York and the evidence submitted in connection with the motions made by the parties for

summary judgment.

This action arises out of an accident that occurred on December 24, 2014, when claimant

Edwin Ramos ("Claimant") tripped and fell in front of a building (the "Building") located at

4123 Third Avenue, Bronx, New York (the "Premises").  Dkt. No. 60 ¶ 8.  Tower's insured

Hinde was the landlord of the Premises and PIIC's insured PRFI was its tenant.  Dkt. No. 65 ¶¶

1–2.  To describe the dispute, the Court outlines (1) the relationship between Hinde and PRFI;

(2) the Tower Policy insuring Hinde and the PIIC Policy insuring PRFI; (3) the relationship

between Technology Insurance and Tower; (4) the prosecution of the Underlying Action; and (5)

the insurance dispute.

## I.      The Relationship and Lease Between Hinde and PRFI

At all relevant times, Hinde was the landlord and PRFI was Hinde's tenant of the

Building located at the Premises.  Dkt. No. 65 ¶¶ 1–2.  The relationship between Hinde and PRFI

was governed by a lease dated March 23, 1998 (the "Lease") that was extended on multiple

occasions, pursuant to which Hinde leased part of the Premises to PRFI, including the entire

ground floor of the Building, and permitted it to use the basement.  *Id*. ¶¶ 2, 5.  The Lease was

effective on December 24, 2014, the day of the incident.  *Id. ¶* 2.  Throughout the term of the

Lease, PRFI was the only tenant and occupant of the Building, which consists of a ground floor

level and two basements.  *Id.* ¶ 3.  One of the basements is accessible from the public sidewalk

abutting the front of the Building through cellar doors.  *Id.*  Throughout the term of the Lease,

the cellar doors were locked by a padlock to which only PRFI had the keys.  *Id.* ¶ 4.

The Lease grants PRFI "a license to use the entire building and adjacent vacant lots," and

permits it to "use the basement area below the demised Premises for storage of supplies only,

and for no other purpose."  *Id.* ¶ 5.  Among other things, the Lease specifies the rent that PRFI is

obligated to pay, the uses to which it may put the demised premises, its responsibilities for

improvements, repairs, and maintenance, and its obligations to indemnify the landlord Hinde for

liabilities imposed or asserted against it by "work or thing[s]" done by PRFI in or about the

Premises or any part thereof.  *See generally* Dkt. No. 66-7.  Under the Lease, PRFI is responsible

"at its own cost and expense [to] keep the sidewalk in front of the Premises free and clear of

snow and ice during the winter months" and "at all times [to] keep the sidewalk clean."  *Id.* ¶ 11.

Otherwise, PRFI has no obligations of maintenance or repair with respect to certain areas outside

the property line of the Building.  With respect to leasing of the "vault space," the Lease

provides as follows:

> 17.  VAULT SPACE
>
> No vaults, vault space or area, whether or not enclosed or covered, not within the
> property line of the building is leased hereunder, anything contained in or indicated
> on any sketch, blue print or plan, or anything contained elsewhere in this lease to
> the contrary notwithstanding.  Owner makes no representation as to the location of
> the property line of the building.

*Id.* ¶ 17.  The Lease requires PRFI to procure general liability insurance "protecting the Landlord

against any liability whatsoever, occasioned by accident or disaster on or about the Premises, or

any appurtenances thereto."  *Id.* ¶ 21.A.

**II.      The Tower and PIIC Insurance Policies**

Hinde was insured under the Tower Policy, Commercial General Liability Policy No.
CPC7004982 04 01, for the period from May 6, 2014 to May 6, 2015, issued by Tower Insurance
Company of New York ("Tower").  PRFI was the named insured under Commercial General
Liability Policy No. PHPK1201832 (the "PIIC Policy"), for the period from July 6, 2014 to July
6, 2015, issued by PIIC.  Dkt. No. 65 ¶ 7.

The Tower Policy provides coverage at the Commercial General Liability Coverage
Form to Hinde for ". . . those sums that the insured becomes legally obligated to pay as damages
because of 'bodily injury' or 'property damage' to which this insurance applies" caused by an
"occurrence."  *Id.*

The PIIC Policy covers PRFI as a named insured, in connection with its occupancy of the
Premises, subject to the PIIC Policy's terms and conditions.  *Id.*  The parties dispute whether
Hinde is covered as an additional insured under the PIIC Policy "with respect to their liability
arising out of the ownership, maintenance, or use of that part of the premises leased or rented to
[PRFI]."[1]  *Id.* ¶ 9.

---

[1] The relevant language of the provision states that:
      Section II –WHO IS AN INSURED is amended as follows:
                          . . .
            f.  Managers, Landlords, or Lessors of Premises – Any person or
            organization with respect to their liability arising out of the ownership,
            maintenance or use of that part of the premises leased or rented to [PRFI]
            … subject to the following exclusions:
            This insurance does not apply to:
      (1) Any "occurrence" which takes place after you cease to be a tenant in that
           premises; or
      (2) Structural alterations, new construction or demolition operations
           performed by or on behalf of that person or organization.
Dkt. No. 461-1 at ECF p. 313.

4

The Tower Policy and the PIIC Policy otherwise have the same "Insuring Agreement" provisions, which describe the obligations to pay for certain damages and the defense, and "Duties In the Event of Occurrence, Offense, Claim Or Suit" provisions, which include timeliness requirements for notice to the respective insurers if an "Occurrence, Offense, Claim or Suit" were to take place.[2]  *Id.* ¶ 10.

---

[2] Those provisions, in relevant part, include the following language:

> SECTION I- COVERAGES
> COVERAGE A- BODILY INJURY AND PROPERTY DAMAGE LIABILITY
> 1.  Insuring Agreement
>     a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the 'suit' are groundless, false or fraudulent.
> . . .
>     b.  This insurance applies to "bodily injury" or "property damage" only if:
>         (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>         (2) The "bodily injury" or "property damage" occurs during the policy period;
> . . .
> SECTION IV – COMMERCIAL GENERAL LIABILITY COVERAGE CONDITIONS
> 2.  Duties In The Event of Occurrence, Offense, Claim or Suit
>     a.  You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.  To the extent possible, notice should include:
>         (1) How, when and where the "occurrence" or offense took place;
>         (2) The names and addresses of any injured persons and witnesses; and
>         (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.
>     b.  If a claim is made or "suit" is brought against any insured, you must:
>         (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
> . . .
>     e.      Notice given by or on behalf of the insured, written notice by or on

### III.    The Relationship Between Tower and Technology

Technology is party to a Commercial Lines Cut-Through Quota Share Reinsurance Agreement (the "Reinsurance Agreement"), dated January 3, 2014, with Tower and others, pursuant to which Technology agreed to reinsure all "Losses" with respect to the Subject Policies. *See generally* Dkt. No. 56-33. Under the Reinsurance Agreement, "each Ceding Company [defined to include Tower] hereby cedes, and the Reinsurer [Technology Insurance] hereby assumes, one hundred percent (100%) of all Losses [defined to include both defense and indemnity payments] . . . for which such Ceding Company is liable in respect of the Subject Policies [defined to include the Tower Policy]." Dkt. No. 56-33 at 7; *see also* Dkt. No. 65 ¶ 13. The Reinsurance Agreement also allows Technology to "at any time, assume authority from the Ceding Companies in all matters relating to the administration of the Insurance Contracts [defined to include the Tower Policy] and any claims thereunder, including but not limited to the authority (i) to pay and adjust Claims on behalf of such Ceding Company." Dkt. No. 56-33 at 13–14; Dkt. No. 65 ¶ 15. It also states that, "in furtherance of the Reinsurer's right to assume authority for administration of Insurance Contracts, each Ceding Company hereby appoints the Reinsurer as its attorney-in-fact with respect to the rights, duties and privileges and obligations of such Ceding Company in and to the Insurance Contracts, including without limitation, the power to service such contracts, to adjust, defend, settle and to pay all Claims, [and] to recover salvage and subrogation for any losses incurred." Dkt. No. 56-33 at 14; Dkt. No. 65 ¶ 15. The Tower Policy includes a "Cut-Through Endorsement," which states in relevant part that:

> This Endorsement is made by and between Technology Insurance Company, Inc. (the "Reinsurer") and TOWER INSURANCE COMPANY OF NEW YORK (the

---

behalf of the injured person or any other claimant, to any agent of ours in New York State, with particulars sufficient to identify the insured, shall be considered notice to us.
Dkt. No. 46-1 at ECF pp. 254, 289.

"Company") for the benefit of the Insured named below with regard to Policy No. CPC7004982 issued by the Company, to the Insured named below (the "Policy")

. . .

The Reinsurer and the Company agree as follows:

In the event that the Company is declared insolvent by a court of competent jurisdiction and is unable to pay loss(es) under the Policy occurring on or after the Effective Date of this Endorsement (a "Covered Loss"), (A) the Reinsurer will be liable to the Insured for such Covered Loss and will make payment directly to the Insured, subject to the terms, limitations and conditions contained in the Policy, (B) the Reinsurer shall be subrogated to all rights of the Insured and the Company to the extent of such payment, and (C) the Insured shall have a direct right of action against the Reinsurer for amounts payable under the Policy with respect to such Covered Loss.

Dkt. No. 65 ¶ 11.

On July 28, 2016, Tower and others entered into the CastlePoint National Insurance Company Conservation Agreement, dated July 28, 2016 ("Conservation Agreement"). Dkt. No. 47-7. The Conservation Agreement recognized that Tower and its affiliates organized in other states had experienced an "adverse development" with respect to their loss portfolio. *Id.* ¶ B. To facilitate an orderly and efficient consolidated conservation of those Tower companies, on or about July 20, 2016, those Tower companies merged with and into CastlePoint National Insurance Company ("Castlepoint") with Castlepoint as the surviving entity, and on July 27, 2016, Castlepoint was placed into conservation proceedings in the Superior Court of San Francisco County, California. *Id.* ¶¶ C, D. The Conservation Agreement provides that CastlePoint assigns to Technology "as its direct obligation to the applicable policyholders or other obligees of the Company [CastlePoint], all of the liabilities of the Company reinsured under [the Reinsurance Agreement]" and that Technology "shall become a direct obligor with respect to insurance thereunder," identified as "each insurance policy reinsured under [the Reinsurance Agreement]." *Id.* § 9.1.10(a)(i).

By order dated March 30, 2017, the Superior Court of the State of California found

CastlePoint to be insolvent and liquidated.  Dkt. No. 17 ¶ 17.

## IV.    The Underlying Action

PIIC was first notified that Claimant was claiming to have been injured on December 24,

2014 in front of the Premises, when PRFI provided a loss notice form and letter dated February

20, 2015 to insurance broker and agent for PIIC, J.A. Faccibene & Associates, Inc.  Dkt. No. 65

¶ 21.  In that letter, Claimant's counsel advised PRFI and Hinde that he "represents [Claimant]

relating to injuries sustained on the above date as a result of negligence at your presmises."  Dkt.

No. 46-5 at ECF p. 6.  On March 4, 2015, the PIIC adjuster assigned to handle the claim, Verona

Cruz, was advised by a paralegal from the office of Claimant's counsel that "the cellar doors in

the sidewalk to the insured location was [sic] the cause of the fall" and that "Hinde Development

is the landlord or property owner of record."  Dkt. No. 65 ¶ 22.

On October 9, 2015, Claimant filed the Underlying Action in New York State Supreme

Court, County of Bronx against Hinde and PRFI, seeking damages for injuries he sustained on

December 24, 2014 when he tripped and fell over the defective metal cellar doors on the

sidewalk abutting the Building.  *Id.* ¶ 31.  The Claimant alleged that defendants had a duty to

keep the Building and the sidewalk abutting it in a reasonably safe condition and that they failed

to discharge that duty, permitting the metal cellar doors to be and remain in an uneven, defective,

misleveled, and raised condition, resulting in his injury.  Dkt. No. 1-5.  The complaint in the

Underlying Action was served on Hinde via the New York Secretary of State on October 26,

2015.  Dkt. No. 65 ¶ 31.

Hinde, however, did not notify PIIC or Technology of the suit.  *See* Dkt. No. 47 ¶ 10

(stating that Technology was first notified on September 12, 2018 of the underlying incident);

Dkt. No. 60 ¶ 3 (Technology admitting that Hinde never notified PIIC of the claim, occurrence,

or the underlying action).  By order dated June 19, 2017, the court in the Underlying Action

granted Claimant's motion for a default judgment against Hinde based on its failure to appear.

*Id*. ¶ 37.  After Technology was notified of the incident, the court, by stipulation so ordered on

October 23, 2018, vacated the default judgment against Hinde in the Underlying Action.  *Id*. ¶

43; *see also* Dkt. No. 46-18 (stipulation).  Hinde deposed the Claimant on July 1, 2019.  Dkt. No.

65 ¶ 45.  On December 20, 2019, Hinde moved for summary judgment on its common law and

contractual indemnification claims against PRFI in the Underlying Action.  *Id*. ¶ 50.  That

motion was denied on December 8, 2020, *id.* ¶ 51, and on April 27, 2021, the court granted

PRFI's motion for summary judgment dismissing all claims against it in the Underlying Action,

*id.* ¶ 53.

### V.       The Insurance Dispute

On February 20, 2015, Claimant's counsel served a claim letter on Hinde and PRFI

informing the two entities that Claimant sustained injuries at what it characterized as the

premises of Hinde and PRFI at 4123 Third Avenue and requesting that the letter be forwarded to

the insurance companies for the two entities.  *Id*. ¶ 21; Dkt. No. 56-36.

Technology was first notified of the Underlying Action on September 12, 2018, after the

lawsuit had seemingly concluded against Hinde, when AmTrust North America ("AmTrust")

forwarded Technology a letter from Claimant's counsel dated September 12, 2018 with the order

granting Claimant's motion for a default judgment against Hinde attached.  Dkt. No. 65 ¶ 38.

Nine days later, on September 21, 2018, AmTrust, acting on behalf of Technology as

insurer for Hinde, also tendered the underlying Ramos claim to PIIC.  Dkt. No. 56-21.  The

tender referred to the fact that the Claimant alleged that he sustained injuries when he tripped and

fell on the cellar doors located on the sidewalk adjacent to the Premises, stated that PRFI was

responsible for the sidewalk cellar doors' maintenance and repair, and demanded that PIIC defend and indemnify Hinde as an additional insured  *Id.*

By letter dated September 26, 2018 to Hinde, with a copy to PRFI's defense counsel in the Underlying Action, AmTrust acknowledged receipt of the claim.  The letter referred to the fact that a default judgment had been entered against Hinde and stated that Hinde had breached the policy provisions regarding timely notice of an occurrence.  On that basis, Technology disclaimed coverage.  Nonetheless, Technology agreed to assign a law firm to attempt to vacate the default judgment subject to a reservation of rights.  The letter advised that in the event the law firm was "unable to vacate the default judgment, we will have been prejudiced by your breach of the policy conditions and no coverage will be available under the policy for this matter."  Dkt. No. 47-10 at 3–4.

Shortly thereafter, by letter of October 4, 2018 to AmTrust, PIIC disclaimed Hinde's claim for coverage with respect to the underlying Ramos claim.  Dkt. No. 56-22.  PIIC asserted in part as follows:

> Review of the lease that you provided addresses sidewalks, the lease indicates that Puerto Rican Family Foundation must keep the sidewalk free of snow or debris with no mention of cellar doors and it is not part of our insured's lease agreement, thus there is no trigger of any additional insured or contractual indemnification coverage.  Even if there were, again your late notice and tender of this matter has prejudiced the defense of this matter per policy terms conditions and exclusions.

> Please note that late notice applies and PIIC has been prejudiced, we therefore deny your tender.

*Id*.

Following Technology's assignment of counsel to vacate the default judgment, on October 23, 2018 the court in the Underlying Action "so ordered" a stipulation between the parties that vacated the default judgment against Hinde.  Dkt. No. 62 ¶ 43.  The stipulation reflected an agreement among Claimant, Hinde, and Technology (through AmTrust).  It stated

that Ramos would agree to vacate the default if Hinde and AmTrust waived certain affirmative and jurisdictional defenses, including its late notice defense under the Policy.  *Id.*; Dkt. No. 63-11 at ECF p. 3.

On July 18, 2019, following the state court's vacatur of the default judgment against Hinde, AmTrust reiterated PIIC's tender by email citing the PIIC Policy's additional insured endorsement and stating that "[PIIC] has not been prejudiced as you claim."  Dkt. No. 47-12.  PIIC stated that it was reviewing the request for reconsideration of the tender by email of August 7, 2019.  Dkt. No. 47-13.  By letter dated August 23, 2019 addressed to PRFI, but copied to AmTrust, PIIC reiterated its denial of coverage to Hinde, stating that "Hinde . . . is responsible for the metal cellar door" and for that reason, "there is no additional insurance coverage available to them under this policy."  Dkt. No. 47-14 at 1–2.  PIIC did not respond to Technology's assertion that PIIC had not been prejudiced.  Rather, the letter stated that "[t]his coverage analysis is not intended to be exhaustive or exclusive.  By mentioning specific grounds that may limit or preclude coverage, PIIC does not intend to waive any other grounds which may currently exist or exist in the future.  All rights are specifically reserved."  *Id.* at 6.

## VI.    The Settlement of the Underlying Action

On October 13, 2021, Technology notified PIIC that it had reached a settlement-in-principle on behalf of Hinde with the Claimant in the amount of $88,000 which it intended to finalize by October 15, 2021.  Dkt. No. 46-26.  The email invited PIIC to object to the settlement and, if it objected, to participate in further settlement discussions with Claimant.  *Id.*  The email to PIIC stated that it was Technology's position that PIIC was "required to defend and indemnify Hinde on a sole, primary basis, and thus that any settlement paid by Technology due to PIIC's refusal to do so will be subject to full recovery by Technology against PIIC in the pending coverage action."  Dkt. No. 65 ¶ 53; Dkt. No 46-6.  PIIC responded the following day that it took

no position with respect to the settlement because it had disclaimed coverage.  Dkt. No. 65 ¶ 54; Dkt. No. 46-27.  Plaintiff claims that AmTrust, on its behalf, and through an account bearing its name and funded by it, paid $88,000 to settle the claim in the Underlying Action against Hinde, and paid $33,278.70 in expenses to defend Hinde in the Underlying Action.  Dkt. No. 65 ¶ 55.

## PROCEDURAL HISTORY

Technology commenced this action on August 5, 2021 by summons and complaint filed in New York State Supreme Court, New York County.  *See generally* Dkt. No. 1-3.  The Complaint sought a judgment: (1) declaring that PIIC has a duty to defend Hinde in the Underlying Action as an additional insured under the PIIC Policy; (2) declaring that PIIC has a duty to indemnify Hinde in the Underlying Action under the PIIC Policy; and (3) declaring that the Tower Policy is excess to the coverage under the PIIC Policy with respect to the Underlying Action; and (4) awarding Technology all amounts it has incurred and will incur defending and, if necessary, indemnifying Hinde in the Underlying Action, plus statutory interest.  *Id.* ¶¶ 12, 15, 21, ECF p. 7 ¶¶ 1–5.

On September 2, 2021, PIIC removed the action to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1), 1441(a), and 1446.  Dkt. No. 1.  The parties proceeded to discovery.

On April 22, 2022, each of Technology Insurance and PIIC moved for summary judgment.  Dkt. Nos. 43, 44.  Opposition briefs were filed on May 24 and May 25, 2022.  Dkt. Nos. 59, 61.  Reply memoranda of law were filed on June 1, 2022.  Dkt. Nos. 67, 68.  On June 6, 2022, the parties agreed to have the case tried to the Court on the basis of the filings submitted in connection with the motions for summary judgment.  Dkt. No. 69.  The Court heard oral argument on November 17, 2022.  Dkt. No. 73.

**DISCUSSION**

Technology argues that it is entitled to a declaratory judgment that: (1) PIIC had a duty to defend and indemnify Hinde in the Underlying Action and (2) that the PIIC Policy is primary to the Tower Policy with respect to Hinde's coverage in the Underling Action.  It also argues that PIIC's late notice defense is meritless, that it is the proper plaintiff, and that it has established an entitlement to the monetary relief that it seeks plus interest from the dates of judgment.  *See generally* Dkt. No. 65.  PIIC argues that Hinde does not qualify as an Additional Insured because the vault doors were not part of the leased premises, that timely notice from Technology was not provided, and that Technology does not have standing to seek reimbursement of sums paid by AmTrust*.  See generally* Dkt. No. 56.  The Court first addresses the question of whether PIIC had a duty to defend and indemnify Hinde as an Additional Insured and then turns to the questions of notice and standing.

**I.     Whether Hinde is an Additional Insured Under the PIIC Policy**

Technology argues that the "standard additional-insured endorsement" covers the lessor for all accidents occurring on public sidewalks abutting the premises leased to the named insured, "no matter the circumstances."  Dkt. No. 49 at 27.  It further notes that the language does not state that the liability must occur "within the leased premises," but that the term "arising out of" in the PIIC Policy requires a broader reading.  *Id*.  Further, it contends that New York courts do not "evaluat[e] which party is responsible for maintaining the sidewalk or whether the sidewalk is part of the leased premises."  *Id*. at 29.  Because Claimant's claim was based on an allegation that he was injured due to a hazardous condition on the sidewalk, PIIC had a duty to defend and indemnify Hinde.  *Id*. at 31–34.

PIIC argues that it does not owe Hinde any duties because Hinde is not an additional insured under the PIIC Policy.  Dkt. No. 57 at 7.  It principally argues that Hinde's lease with

PRFI does not cover the outside of the vault and that therefore, under the PIIC Policy, Hinde does not have additional insured status because such status is only relevant to "that part of the premises leased or rented to [PRFI]."  *Id.*  It argues that such an interpretation affords "fair meaning to all of the language" in the Policy.  *Id*. at 8.  It further contends that the Claimant was only a passerby, and not a client, patron, invitee, or visitor of PRFI, and thus was not on his way into or out of the Building, and thus there was no duty running from PRFI to the Claimant.  *Id*. at 9.  Further, the terms of the Lease specify that the vault space is not within the property leased to PRFI and that the doors to such vault remained the responsibility of Hinde, and thus PRFI had no responsibility for that space.  *Id.*  For the following reasons, the Court concludes that Hinde qualified as an "additional insured" under the PIIC Policy.

A.     The Terms of the Policy and the Lease

PIIC's named insured was PRFI.  PIIC owed a duty to defend or indemnify Hinde only if Hinde qualified as an "additional insured."  In order to qualify as an "additional insured," the PIIC Policy provides that:

2. Each of the following is also an insured:

. . .

f. Managers, Landlords, or Lessors of Premises — Any person or organization with respect to their liability *arising out of the ownership, maintenance or use of that part of the premises leased or rented to you* subject to the following additional exclusions:

This insurance does not apply to:

(1) Any "occurrence" which takes place after you cease to be a tenant in that premises; or

(2) Structural alterations, new construction or demolition operations performed by or on behalf of that person or organization.

Dkt. No. 65 ¶ 8 (emphasis added); Dkt. No. 46-1 at 314.  In particular, the Policy terms do not allow for coverage of Hinde as an "additional insured" if the liability arose out of a part of the premises not leased or rented to PRFI.  Under the terms of Hinde's lease to PRFI, Hinde did not lease certain vaults or vault space.  The Lease states that:

> No vaults, vault space or area, whether or not enclosed or covered, not within the property line of the building is leased hereunder, anything contained in or indicated on any sketch, blue print or plan, or anything contained elsewhere in this lease to the contrary notwithstanding. Owner makes no representation as to the location of the property line of the building.

Dkt. No. 63-7 ¶ 17.

"An insurance agreement is subject to principles of contract interpretation."  *Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017) (quoting *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 80 (N.Y. 2015)).  "As with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court."  *Id*. (quoting *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 884 N.E.2d 1044, 1047 (N.Y. 2008)) (internal quotation marks omitted).  "[C]ourts should read a contract as a harmonious and integrated whole to determine and give effect to its purpose and intent."  *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 747 (N.Y. 2017) (internal quotation marks omitted).  "Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements."  *Id.* at 748.  "In that regard, a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'"  *Id.* (quoting *Ronnen v. Ajax Elec. Motor Corp.* 671 N.E.2d 534, 536 (N.Y. 1996)).

The language of the PIIC Policy has been the subject of numerous decisions in the New York courts. *See*, *e.g.*, *Isidore Margel Tr. Mitzi Zank Tr. v. Mt. Hawley Ins. Co.*, 145 N.Y.S.3d 817, 818 (2d Dep't 2021). Those courts have held that the language triggers additional insured coverage for accidents occurring as a result of defects outside the perimeter of the leased premises in at least two separate circumstances. First, relying on the policy language regarding liability that arises out of the "ownership" of the premises that are leased, the New York courts have held that the owner or landlord is entitled to be treated as an additional insured when the claim arises from an accident on a sidewalk appurtenant to the leased premises. In that instance, liability arises out of the ownership of the property abutting the sidewalk. New York City Administrative Code Section 7-210 makes it "the duty of the owner of real property abutting any sidewalk, including, but not limited to, the intersection quadrant for corner property, to maintain such sidewalk in a reasonably safe condition" and makes the owner of real property abutting any sidewalk "liable for any injury to property or personal injury proximately caused by the failure of such owner to maintain such sidewalk in a reasonably safe condition." N.Y.C. Admin. Code § 7-210(a), (b). Section 7-210 "imposes a nondelegable duty on the owner of the abutting premises to maintain and repair the sidewalk." *Collado v. Cruz*, 917 N.Y.S.2d 178, 179 (1st Dep't 2011). The New York courts reason that even if the landlord does not own the sidewalk and therefore cannot lease it, the duty to maintain it in reasonably safe condition arises by virtue of its ownership of the leasable abutting premises. When the premises have been leased and an accident occurs by virtue of the failure of the sidewalk to be maintained, the landlord's liability arises as a result of its ownership of the leased premises and additional insured coverage is triggered. *See*, *e.g.*, *Isidore Margel Tr. Mitzi Zank Tr.*, 145 N.Y.S.3d at 818 (holding that plaintiff was an additional insured for liability "arising out of the ownership, maintenance or

use" of that part of the premises leased to the tenant on the basis that Section 7-210 imposes

liability on owners of commercial property for defective conditions on sidewalks and that, as a

result, the plaintiff's potential liability arises from its ownership of the premises leased to the

tenant); *Frank v. Cont'l Cas. Co.*, 999 N.Y.S.2d 836, 838 (2d Dep't 2014) ("Inasmuch as

Administrative Code of the City of New York § 7-210 imposes liability on owners of

commercial property for defective conditions on sidewalks, the plaintiffs' potential liability

arises from their ownership of the leased premises."); *L & B Ests., LLC v. Allstate Ins.*, 897

N.Y.S.2d 188, 190–91 (2d Dep't 2010) (same).

Second, relying on the portion of the policy language referring to liability arising from

the "maintenance or use of the leased premises," the New York courts have held that additional

insured coverage is triggered for accidents that occur in areas that serve as points of ingress or

egress from the leased premises.  That was the express holding of the New York Court of

Appeals in *ZKZ Associates LP v. CNA Insurance Company*, 679 N.E.2d 629 (N.Y. 1997).  There,

a pedestrian allegedly tripped and fell on the sidewalk outside a building leased by the plaintiff to

the named insured, a garage.  *Id*. at 629.  The New York Court of Appeals held that "[t]he part of

the sidewalk where the alleged accident occurred was necessarily used for access in and out of

the garage Guardian operated and was thus, by implication, 'part of the . . . premises' that

Guardian was licensed to use under the parties' agreement."  *Id*. at 630.  Consequently, "the

claim arose out of 'the ownership, maintenance [or] use of' the garage."  *Id*.; *see also Town

Plaza of Poughquag, LLC v. Hartford Ins. Co.*, 175 F. Supp. 3d 93, 101 (S.D.N.Y. 2016) ("*ZKZ

Associates* has been applied by courts to hold that the insurers of lessees have a duty to defend

and indemnify lessors for injuries occurring on sidewalks and areas outside of demised leases.");

*Wesco Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 135 N.Y.S.3d 384, 386 (1st Dep't 2020)

("Waldman is covered as an additional insured by the Travelers policy in connection with the underlying action because the action arose from the 'use' of the leased premises, *i.e.*, plaintiff's use of the sidewalk as a means of egress from the bank branch building."); *Public Serv. Mut. Ins. Co. v Nova Cas. Co.*, 114 N.Y.S. 3d 47, 48 (1st Dep't 2019) (holding that policy language applies for an accident that "occurred in the course of activity incidental to the operation of the leased space and in an area of the premises that was used for access in and out of the leased space covered under the policy").[3]

### B.    The Duty to Defend and Indemnify

Under New York law, an insurer owes its insured a duty to defend under either one of two circumstances.  First, under the "four corners" rule, "[a]n insurer's duty to defend 'arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim.'"  *Worth Const. Co. v. Admiral Ins. Co.*, 888 N.E.2d 1043, 1045 (N.Y. 2008) (quoting *Frontier Insulation Contractors v. Merchants Mut. Ins. Co.*, 690 N.E.2d 866, 868 (N.Y. 1997)).  "This standard applies equally to additional insureds and named insureds."  *Id.*  Those allegations must be "liberally construed" and "[a]ny doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier."  *Euchner-USA, Inc. v. Hartford Cas. Ins.* Co., 754 F.3d 136, 141 (2d Cir. 2014) (quoting *Brook Shopping Ctr. v. Liberty Mut. Ins. Co.*, 439 N.Y.S.2d 10, 12 (1st Dep't 1981)); *see also Euchner-USA, Inc.*, 754 F.3d at 140 (describing that duty as "exceedingly broad").  "Second, and importantly, because 'the duty to defend derives, in the first instance, not from the complaint

---

[3] Certain of the cases cited by the parties are not particularly relevant.  In *DeForte v. Allstate Ins. Co.*, 442 N.Y.S.2d 307 (4th Dep't 1981), additional insured coverage was triggered by policy language that provided additional insured coverage for "all operations necessary or incidental to the business of the Named Insured conducted at or from the insured premises." *Id.* at 309.  The PIIC Policy does not contain similar language.

drafted by a third party, but rather from the insurer's own contract with the insured,' the Court is also obligated to examine the information possessed by the insurer." *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 324 (S.D.N.Y. 2020) (quoting *Fitzpatrick v. Am. Honda Co.*, 575 N.E.2d 90, 93 (N.Y. 1991)). "Thus, even when the complaint itself does not contain facts or law suggesting a possibility of coverage, the insurer is required 'to provide a defense when it has actual knowledge of facts establishing a *reasonable possibility* of coverage.'" *Id.* (quoting *Fitzpatrick*, 575 N.E.2d at 93) (emphasis added).

"An insurer's duty to indemnify is narrower and distinct from the duty to defend." *Town Plaza of Poughquag, LLC v. Hartford Ins. Co.*, 175 F. Supp. 3d 93, 99 (S.D.N.Y. 2016); *see also Euchner-USA, Inc.*, 754 F.3d at 140. Unlike a duty to defend, a duty to indemnify cannot be triggered by the mere possibility of coverage; rather, it is triggered by an independent factual finding that the insured's liability is within the coverage provided by the policy. *See Servidone Const. Const. Corp. v. Security Ins. Co.,* 477 N.E.2d 441, 444 (N.Y. 1985).

The Additional Insured provision states that it provides coverage for "Managers, Landlords, or Lessors of Premises," which encompasses "[a]ny person or organization with respect to their liability *arising out of the ownership, maintenance or use of that part of the premises leased or rented to [PRFI].*" Dkt. No. 65 ¶ 8 (emphasis added); Dkt. No. 46-1 at 314. Because the PIIC Policy provides that additional coverage arises from "ownership," "maintenance," or "use" in the disjunctive, Dkt. No. 65 ¶ 8; Dkt. No. 46-1 at 314, each term is entitled to be given independent meaning. Each term can independently provide a trigger for "additional insured" coverage. Further, under the Additional Insured provision, it does not matter whether the "ownership, maintenance, or use" is tied to the landlord or tenant. Additional

insured coverage could arise from ownership by the landlord, or by use by the tenant, under the Additional Insured provision of the PIIC Policy.

With respect to the duty to defend, the allegations here reasonably could be read to state a claim within the coverage of the policy for at least three separate reasons.

First, the Sidewalk Law defines the failure to maintain a sidewalk in a reasonably safe condition to "include, but not be limited to, the negligent failure to install, construct, repave, repair or replace defective sidewalk flags and the negligent failure to remove snow, ice, direct or other material from the sidewalk."  N.Y.C. Admin. Code § 7-210(b).  (Sidewalk flags refer to the specific squares of the sidewalk.)  Under New York City Administrative Code § 19-152, the commission has authority to direct the owner of real property abutting a sidewalk to repair sidewalk flags that contain a "substantial defect" and the regulations define "substantial defect" to include "hardware defects" such as "(i) hardware or other appurtenances not flush within 1/2″ of the sidewalk surface or (ii) cellar doors that deflect greater than one inch when walked on, are not skid resistant or are otherwise in a dangerous or unsafe condition."  N.Y.C. Admin. Code § 19-152(6).  From both the state court pleadings and under the subsequent state court order, Hinde had potential liability for the underlying claim because that liability arose from a portion of the premises leased to PRFI.  The Claimant's complaint in the Underlying Action alleged that "defendant, HINDE DEVELOPMENT, LLC . . . was a domestic limited liability company organized . . . under . . . the laws of the State of New York," Dkt. No. 46-9 ¶ 2, that "defendants were the owners of a certain building located at 4123 Third Avenue," *id*. ¶ 4, and "were obligated to keep the Building and the sidewalk abutting the Building in a reasonably safe condition," *id*. ¶ 9.  Moreover, as documented *infra* pp. 22–23, the state court reached the conclusion that Hinde's ownership of the building (which was leased to PRFI) gave rise to a duty

to maintain and repair the sidewalk, the failure of which led to claimant's injury.  *See* Dkt. No. 46-25 at 3–6.  Hinde thus had a duty to defend based upon the "ownership" prong of the Additional Insured clause.

PIIC argues that while sidewalks are covered under New York City Administrative Code § 7-210, "features or structural parts of the sidewalks themselves" are not similarly covered.  *See* Dkt. No. 56 at 11.  Similarly, PIIC argues that the cellar doors are better characterized as part of the "street," and not the sidewalk, under 34 Rules of the City of New York § 2-07, which addresses "underground street access covers, transformer vault covers, and grating."  34 RCNY § 2-07(b)(1).  *See* Dkt. No. 56 at 10.  Both arguments are unpersuasive.  None of the cases cited by PIIC deal with cellar doors or mention New York City Administrative Code § 19-152.  It is undisputed that the appurtenance at issue were doors that led to a private basement below the building.  Dkt. No. 66-7 ¶ 61.  They are thus "cellar doors" that are covered under Section 19-152, not "street access covers" or a "transformer vault cover" or "grating" within the meaning of 34 Rules of the City of New York § 2-07.  "Court[s] look[] to . . . section 19-152 . . . as the background underlying Section 7-210's enactment and a 'guidepost for determining [its] scope.'" *Marino v. 101 MacDougal St. LLC*, 2014 WL 12539359, at *3 (S.D.N.Y. Aug. 18, 2014); *see also Hernandez v. NY Prepaid Wireless LLC*, 170 N.Y.S.3d 29, 30 (1st Dep't 2022) ("As the owner of the property abutting the sidewalk, Madison had a nondelegable duty to maintain the sidewalk—*which included the cellar doors* (Administrative Code of City of New York §§ 19– 101[d]; 19–152[a][6], [a–1][6])—in a reasonably safe condition (Administrative Code § 7– 210[a])." (emphasis added)).

Second, even if the responsibilities for the sidewalk and the cellar doors are legally distinguishable under the Sidewalk Law, it would have been by no means clear that liability

would arise solely or primarily as a result of the failure to maintain the cellar doors as opposed to from a defect on the sidewalk flag itself.  After all, the sidewalk abuts the cellar doors.  If Claimant tripped due to a difference in level between the sidewalk and the cellar doors, it is just as likely that a defect in the sidewalk was a cause of the accident as it was that a defect in the cellar doors was the cause of the accident.  The allegations of the complaint are sufficient for this theory of liability.  *See* Dkt. No. 1-5 ¶ 9 (the underlying complaint stating that the "defendants[] were obligated to keep the Building *and the sidewalk* abutting the Building in a reasonably safe condition" (emphasis added)); *id.* ¶ 11 (the underlying complaint describing the "misleveled" and "raised" condition of the "metal cellar door"); *see also Frank v. Cont'l Cas. Co.*, 999 N.Y.S.2d at 838 ("If the allegations of the complaint are even potentially within the language of the insurance policy, there is a duty to defend.").  In short, the four corners of the complaint reasonably put Hinde on notice that the defect may have been from the sidewalk, rather than the cellar doors.

Third, under Claimant's theory, Hinde's liability would also "aris[e] out of" the "use" of "that part of the Premises leased" to PRFI.  PIIC argues that Hinde did not lease the cellar doors to PRFI under the terms of the Lease because the doors fell outside of the property line and thus were not included in "*that* part of the Premises leased to" PRFI under the Additional Insured provision of the PIIC Policy.  *See* Dkt. No. 61 at 17 (emphasis added) (quoting the PIIC Policy).  But the Additional Insured provision is not limited to incidents occurring directly on leased property.  *See Pub. Serv. Mut. Ins. Co. v. Nova Cas. Co.*, 114 N.Y.S.3d 47, 48–49 (1st Dep't 2019) (finding contention that accident in an unleased stairwell area was not dispositive as to defense and indemnity claim); *Paramount Ins. Co. v. Fed. Ins. Co.*, 106 N.Y.S.3d 300, 301 (1st Dep't 2019) (same).  The provision covers "liability *arising out of* the ownership, maintenance or

use of that part of the premises leased or rented to [PRFI]."  Dkt. No. 461-1 at ECF p. 313

(emphasis added).  And New York courts have read the term "arising out of" to simply include

"having connection with" or "incident to."  *Worth Const. Co.*, 888 N.E.2d at 1045.  Here, the

Lease provided PRFI "a license to use the entire building," and with respect to the area under the

cellar doors, that PRFI "may further use the basement area below the demised Premises for

storage of supplies only."  Dkt. No. 63-7 ¶ 61.  The cellar doors provided a means of ingress and

egress and thus was incident to, or had connection with, use of the leased area.  As for "use" of

the cellar, it is generally undisputed that PRFI had the key to the lock of the cellar doors.  *See*

Dkt. No. 65 ¶ 4; *see also* Dkt. No. 66-3 at 25 (Q: "But somebody, either you or somebody else

has the key to the padlock for the basement with the cellar door; is that right?" A: "Yes, the

clinic has it.").  And if anyone needed to read the gas meter for the building, they would need to

ask PRFI for the key.  Dkt. No. 66-3 at 25–26.  It is sufficient for additional insured coverage

that the cellar doors would be used "in connection with" the part of the Premises which PRFI

leased.  *See Worth Const. Co.*, 888 N.E.2d at 1045.  PRFI was entitled to "use" the basement

area, and access to the area was also necessary to "maintain" the leased premises.

The answer is even more straightforward as to Hinde's duty to indemnify.  The state

court held that the accident arose out of the failure to repair the cellar doors and that Hinde's

ownership of the building gave rise to a duty under the Sidewalk Law to "maintain and repair the

sidewalk abutting the [building]," including the "hardware or other items installed in the

sidewalk appurtenant to the owner's property and for the use and benefit of the property owner."

Dkt. No. 65 ¶ 52; Dkt. No. 46-25.  In granting PRFI's motion for summary judgment on April

27, 2021, it expressly stated "[c]ellar doors are . . . part of the property owner's obligation under

section 7-210."  *Id.*  It further stated that "[b]ecause Hinde would be actively negligent for failing

to maintain the sidewalk in accordance with the Administrative Code, it would not be entitled to common-law indemnification and its cross claim for common-law indemnification against PRFI is also dismissed." *Id.* That independent factual conclusion links Hinde as an "additional insured" under the "ownership" prong of the Additional Insured provision of the PIIC Policy and thus triggers the duty to indemnify. *See Isidore Margel Tr. Mitzi Zank Tr.*, 145 N.Y.S.3d at 818.

PIIC argues that PRFI had no responsibility for the vault area or doors outside the property line, and that that area was not part of the leased premises. Dkt. No. 56 at 11. But the allocation for upkeep or repairs under the Lease is not dispositive of coverage under the insurance policy. "Coverage is determined by the terms of the policy, and is not affected by the finding in the underlying action that Waldman may have failed to satisfy any legal obligations to maintain the sidewalk." *Wesco Ins. Co*, 188 A.D.3d at 477. Coverage arises under the terms of the PIIC Policy by virtue of Hinde's ownership of the leased premises and PRFI's use of the leased premises, and not from any claim that PRFI had responsibility for the cellar doors. The provision focuses on whether the liability "aris[es] out of" the ownership, maintenance, and use of the leased premises, with no mention of the landlord or tenant as to those specific prongs. Whether it was PRFI or Hinde which was responsible for maintenance is thus irrelevant to the determination of coverage.

PIIC also argues that because the Claimant was only a passerby, and not a client, patron, invitee, or visitor of PRFI, that it could not "create a duty which ran from PRFI to the [Claimant]." Dkt. No. 56 at 9. But that fact is irrelevant as to whether Hinde had a duty under New York law to the Claimant by virtue of its ownership of the leased abutting premises, as "th[e] duty [from Section 7-210] is imposed without regard to whether the sidewalk might be or is used by the tenant's patrons or by passersby." *See 76-01 37th Ave. Realty Corp. v. Dongbu*

*Ins. Co.*, 2015 WL 5643614, at *1 (N.Y. Sup. Ct. Sep. 25, 2015) (finding duty to defend for underlying plaintiff who tripped and fell in front of pizza store as he was walking from his apartment to the supermarket), *rev'd on other grounds*, 146 A.D.3d 448 (1st Dep't 2017). And New York law does not require that the claimants have any such status in order to find that an incident arises from the "use" of the leased premises. *Donato Realty, LLC v. Utica First Ins. Co.*, 2016 WL 3902273, at *2 (N.Y. Sup. Ct. July 15, 2016) *aff'd*, 45 NY.S. 3d 54 (1st Dep't 2017) (stating that where "liability exists as a result of an accident 'arising out of' use of leased area," that if it is an area that people "would have to traverse in order to reach the leased space," there can be liability "even when the injured person was not entering or exiting the establishment at the time he or she was injured").

Finally, PIIC argues that the cases cited by Technology did not involve a fall on vault doors or "a claim in a location which the landlord and tenant mutually agreed in writing were not part of the leased premises." Dkt. No. 67 at 2, 4. It is true that none of the cases cited by Technology specifically involved a cellar door, but PIIC fails to explain why that is a meaningful distinction. With respect to "ownership," the cellar doors are expressly encompassed within the "scope" of the Sidewalk Law that attaches liability to owners of property abutting the sidewalk. *See Hernandez*, 170 N.Y.S.3d at 30. That PRFI and Hinde expressly disclaimed any lease of the *vault area* outside the property line in Paragraph 17 of the Lease does not mean that the loss did not arise from the ownership of leased area itself—separate from that vault area—which includes liability for the abutting cellar doors under the Sidewalk Law. With respect to the "use" and "maintenance" prongs of the policy, PIIC's argument reads the term "arising out of" out of the Additional Insured provision. As noted, that term covers liability that arises from areas necessary for ingress and egress and not just from the leased premises itself. It is sufficient that

25

the liability arose from the ownership or use of the demised premises even if the specific location of the accident was elsewhere.  Coverage, in short, does not depend on whether the cellar doors were leased to PRFI.

## II.     Whether the Policy is Vitiated by AmTrust's Delayed Notice

PIIC argues that coverage is vitiated as a matter of law by virtue of the late notice delivered by Tower, acting through AmTrust.  PIIC first notes that Hinde—even if it were an additional insured under the PIIC Policy—never reported the occurrence, the demand letter, the underlying action, or sought coverage under the PIIC policy.  Dkt. No. 56 at 20.  Instead, AmTrust tendered the Underlying Action to PIIC on September 21, 2018, more than three and a half years after the Claimant had first served notice on Hinde on February 20, 2015, Dkt. No. 65 ¶ 21, and nearly three years after the New York Secretary of State served Hinde on October 27, 2015, *id.* ¶ 31.  PIIC argues that this tender was both insufficient and untimely as a matter of law. Dkt. No. 56 at 12.  Technology principally contends that PIIC has waived its delayed notice defense and that PIIC was not prejudiced by Hinde's notice delay.  Dkt. No. 49 at 20–22.  For the following reasons, the Court holds that AmTrust's delayed notice does not vitiate the policy.

### A.     Waiver

Technology first argues that PIIC waived its late notice defense because it did not raise that defense in its second disclaimer letter, which was purportedly issued in response to AmTrust's second tender.  Dkt. No. 49 at 20–23.  PIIC argues that nothing in its second letter evinced its intent to waive its late notice defense, which it had asserted in its first disclaimer letter.  Dkt. No. 61 at 4.  It also argues that the second letter was not issued in response to AmTrust's second tender.  *Id.*  For the following reasons, the Court concludes that PIIC did not waive its late notice defense.

Under New York law, waiver is "an intentional relinquishment of a known right and should not be lightly presumed." *Gilbert Frank Corp. v. Federal Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988). Waiver "will not be implied unless the opposite party is misled to his or her prejudice into the belief that a waiver was intended . . . hence, a finding of waiver cannot be based upon 'mere silence or oversight,' or upon 'mistake, negligence or thoughtlessness.'" *Id.* (alterations accepted and citations omitted). "The burden of proving waiver rests with the party asserting it." *Homapour v. Harounian*, 160 N.Y.S.3d 223, 225 (1st Dep't 2021).

Following receipt of AmTrust's first tender letter dated September 21, 2018, PIIC informed AmTrust that because "this Action presently lists Hinde Development LLC in default with a judgment entered on against Hinde Development, you have prejudiced any defense in this matter." Dkt. No. 47-11 at ECF p. 2. The letter concludes by asserting that "late notice applies and PIIC has been prejudiced, [and] therefore [PIIC] den[ies] your tender." *Id.* at ECF p. 3. PIIC does not dispute that the first letter only asserted a late notice defense with respect to notice of the suit, not of the occurrence or the claim. Technology then argues that because PIIC's only claimed prejudice for its late-notice-of-dispute defense was based upon a default judgment, Dkt. No. 46-18, PIIC waived its late-notice-of-suit defense by not including it in its second reply letter following AmTrust's resubmitted tender after the default judgment was vacated, Dkt. No. 47-12. That second letter was addressed to PRFI and copied to AmTrust. Dkt. No 47-14.

Technology's argument is unpersuasive. First, PIIC's second letter indicated that the "coverage analysis is not intended to be exhaustive or exclusive" and that "PIIC does not intend to waive any other grounds which may currently exist." *Id.* at 6. Second, this letter was addressed to PRFI and not to Hinde or AmTrust. Cruz credibly testified that the letter was intended to "address[] [her] insured [PRFI]," and not AmTrust. *See* Dkt. No. 46-3 at 110, 118.

27

Although Technology calls this testimony "self-serving" in its reply brief, Dkt. No. 68 at 3, Technology provides no evidence other than the timing of the second letter and the fact that AmTrust was copied on it to show PIIC's intent to waive.  Even if PIIC may have been prompted to inform PRFI in response to the second tender from AmTrust, *see*, *e.g.*, Dkt. No. 46-3 at 116–124, that alone would not suffice to show PIIC's intent to waive its previously-asserted defense. In light of the full record, the facts proffered by Technology alone are insufficient to carry its burden of showing "a *clear manifestation of intent* by defendant to relinquish the protection of the [late notice defense]."  *Gilbert Frank Corp.*, 520 N.E.2d at 514 (emphasis added).  Based on "an examination of all factors," *Estee Lauder Inc. v. OneBeacon Ins. Grp.*, LLC, 28 N.Y.3d 960, 961 (1st Dep't 2016), the Court finds that PIIC did not waive its defense.

### B.    The Applicability of Notice Provisions

The parties disagree on whether unreasonable delay alone suffices for allowing AmTrust to defeat Technology's coverage claims.  PIIC argues that under the "no-prejudice" rule under New York common law, PIIC need not show prejudice resulting from such unreasonable delay, and that late notice from AmTrust on behalf of Technology alone vitiates Technology's claim. Dkt. No. 56 at 15.  Technology responds that Section 3420(a)(5) of New York Insurance Law requires that PIIC show that it was prejudiced by any such delay, that to interpret Section 3420(a)(5) as not applying to insurer-insurer claims would lead to absurd outcomes, and that AmTrust cannot show any such prejudice.  Dkt. No. 59 at 14.  PIIC contends that Section 3420(a)(5) does not apply to insurer-insurer claims and, in any event, that it was prejudiced. Dkt. No. 67 at 10.  For the following reasons, the Court concludes that Technology's notice of suit was unreasonably delayed, that PIIC must show prejudice from that unreasonable delay, and that PIIC was not prejudiced.

### 1.      Reasonable Notice

Under New York common law, "[n]otice provisions in insurance policies afford the insurer an opportunity to protect itself, and the giving of the required notice is a condition to the insurer's liability." *Sec. Mut. Ins. Co. of New York v. Acker-Fitzsimons Corp.*, 293 N.E.2d 76, 78 (N.Y. 1972).  Such provisions "gives the carrier an opportunity to investigate claims while evidence is fresh; allows the carrier to make an early estimate of potential exposure and establish adequate reserves and gives the carrier an opportunity to exercise early control of claims, which aids settlement." *Argo Corp. v. Greater New York Mut. Ins. Co*., 827 N.E.2d 762, 764 (N.Y. 2005).  When a notice provision "requires that notice of an occurrence or claim be given promptly" or "requir[es] notice as soon as possible, notice must be given within a reasonable time in view of all of the facts and circumstances." *New York Marine & Gen. Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 485 F. Supp. 3d 398, 406 (S.D.N.Y. 2020) (internal quotation marks omitted).  "Whether a delay in notifying the insurer is reasonable is a question of fact normally left for determination at trial, but where the insured provides no excuse for the delay in notifying the insurer, and where mitigating circumstances are absent, the issue may be disposed of as a matter of law in advance of trial." *U.S. Underwriter's Ins. Co. v. Ziering*, 2009 WL 238562, at *6 (E.D.N.Y. Feb. 2, 2009).  Such excuses can include "lack of knowledge that an accident has occurred" or "a good-faith belief of nonliability," *Sec. Mut. Ins. Co. of New York*, 293 N.E.2d at 78 (first citing *Rushing v. Com. Cas. Ins. Co.*, 167 N.E. 450, 451 (N.Y. 1929) (Cardozo, J.), then citing *875 Forest Ave. Corp. v. Aetna Cas. & Sur. Co.*, 322 N.Y.S.2d 53, 55 (1st Dep't 1971), *aff'd sub nom*. *875 Forest Ave. Corp. v. Aetna Cas & Sur Co.*, 283 N.E.2d 768 (N.Y. 1972)).  New York courts "have held unexcused delays of about a month or two months to be unreasonable as a matter of law." *Tower Ins. Co. of N.Y. v. Commissary Direct, Inc.*, 115 N.Y.S.3d 613 (Table), 2019 WL 2202746 at *6 (Sup. Ct. May 13, 2019) (citing cases involving

unreasonable delays ranging from 31 days to 76 days); *see also Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*, 421 Fed. App'x 52, 57 (2d Cir. 2011) (summary order) (holding that an "over three-month" delay between the recognition of possible liability and notice was unreasonable); *Mt. Hawley Ins. Co. v. Abraham Little Neck Dev. Grp., Inc.*, 825 F. Supp. 2d 384, 391 (E.D.N.Y. 2011) (holding that delay of seven months was untimely); *Ziering,* 2009 WL 238562, at *6 (collecting cases).

The notice requirement applies not only to the insured, but also those who "stand[] in the shoes of the assured, and must abide by his case when suing on the policy." *Rushing*, 167 N.E. at 451. However, the theory of recovery differs based on the entity or person seeking recovery and what they are seeking recovery for. For example, although a person injured by the insured is not in contractual privity with the insured's insurer, New York insurance law established a "statutory right, presently codified at Insurance Law § 3420," that "grants an injured party a right to sue the tortfeasor's insurer, but only under limited circumstances." *DeLuca v. RLI Ins. Co.*, 131 N.Y.S.3d 716, 719 (2d Dep't 2020); *see also* N.Y. Ins. Law § 3420(b).[4] Thus the injured,

---

[4] N.Y. Insurance Law § 3420(b) provides that:

(b) Subject to the limitations and conditions of paragraph two of subsection (a) of this section, an action may be maintained by the following persons against the insurer upon any policy or contract of liability insurance that is governed by such paragraph, to recover the amount of a judgment against the insured or his personal representative:

(1) any person who, or the personal representative of any person who, has obtained a judgment against the insured or the insured's personal representative, for damages for injury sustained or loss or damage occasioned during the life of the policy or contract;

(2) any person who, or the personal representative of any person who, has obtained a judgment against the insured or the insured's personal representative to enforce a right of contribution or indemnity, or any person subrogated to the judgment creditor's rights under such judgment; and

the other judgment creditors, and those subrogated to the judgment creditor's rights may pursue claims against the insurer to recover a judgment against that insurer's insured under Section 3420. *Id.* "Once the statutory prerequisites are met, the injured party steps into the shoes of the tortfeasor and can assert any right of the tortfeasor-insured against the insurance company." *DeLuca*, 131 N.Y.S.3d at 719 (quoting *Lang v. Hanover Ins. Co.*, 820 N.E.2d 855, 858 (N.Y. 2004)). Such claims must be made "under the terms of the policy," N.Y. Ins. Law § 3420(a)(2), or "upon any policy or contract of liability insurance," N.Y. Ins. Law § 3420(b). *See also Coleman v. New Amsterdam Cas. Co.*, 160 N.E. 367, 368 (N.Y. 1928) (Cardozo, J.) (describing how the New York insurance statute requires that an action by the injured be maintained under the policy terms because otherwise "insurers would be helpless to defend themselves against chicanery or covin. They might then be held, though there had been neither notice of the claim nor opportunity reasonably prompt to investigate the merits").

### 2.    Implied Indemnification

New York courts have described claims for payment between co-insurers that are not proportional or ratable, and are based on coverage for the same insured, as arising under the theory of recovery of implied indemnification.[5] *See, e.g.*, *Aetna Cas. & Sur. Co. v. Merchants Mut. Ins. Co.*, 435 N.Y.S.2d 125, 127 (3d Dep't 1980), *abrogated on other grounds by Motor*

---

(3) any assignee of a judgment obtained as specified in paragraph one or paragraph two of this subsection, subject further to the limitation contained in section 13-103 of the general obligations law.

[5] At oral argument, Plaintiff similarly characterized their claim as one that arose under the theory of implied indemnification. The fact that the parties may have referred to such claims as one for "contribution" is not controlling. *Glaser v. M. Fortunoff of Westbury Corp.*, 524 N.E.2d 413, 415 (N.Y. 1988) ("The parties' designation of the claim is not, of course, controlling . . . . Rather, whether apportionment or common-law indemnity should be applied in a given case requires a careful analysis of the theory of recovery against each tort-feasor." (internal quotation marks omitted and alterations accepted)).

*Vehicle Acc. Indemnification Corp. v. Aetna Cas. & Sur. Co.*, 674 N.E.2d 1349 (N.Y. 1996); *see also U.S. Fire Ins. Co. v. Fed. Ins. Co.*, 858 F.2d 882, 887 (2d Cir. 1988); *cf. Gen. Conf. of Seventh-Day Adventists (Risk Mgmt. Servs.) v. AON Reinsurance Agency*, *Inc.*, 860 F. Supp. 983, 986 (S.D.N.Y. 1994), *aff'd sub nom. Gen. Conf. v. AON Reinsurance Agency*, Inc., 50 F.3d 2 (2d Cir. 1995).  "Conceptually, implied indemnification finds its roots in the principles of equity," *McDermott v. City of N.Y.*, 406 N.E.2d 460, 462 (N.Y. 1980), although "the action is and has been an action at law," *id*. at 462 n.2.  "It is nothing short of simple fairness to recognize that 'a person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity.'"  *Id*. (quoting Restatement (First) of Restitution § 76 (1937)) (alterations accepted).  "To prevent unjust enrichment, courts have assumed the duty of placing the obligation where in equity it belongs."  *Id.*; *cf. Maryland Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 210, 212 (2d Cir. 2000) (stating that an action in contribution "hinges on equitable principles" and that the "controlling inquiry under an equitable analysis is whether one party is unjustly enriched at the expense of another—the law abhors unjust enrichment").  "As was true with many unjust enrichment cases, the vehicle through which the law operated was the quasi contract. . . .  Thus, the rule developed that 'where payment by one person is compelled, which another should have made[,] a contract to reimburse or indemnify is implied by law.'"  *McDermott*, 406 N.E.2d at 462 (alterations accepted).

One variant of such theory has been described as "implied contract theory of indemnification," which "applies when the proposed indemnitee holds a non-delegable duty to a third party, but transfers this responsibility to the proposed indemnitor by implied agreement." *Gen. Conf. of Seventh-Day Adventists (Risk Mgmt. Servs.)*, 860 F. Supp. at 986; *see also*

*Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346, 351 (2d Cir. 1986) (describing the variants of the implied indemnification theory).  In an analogous context involving "partial indemnification" or "contribution," the Second Circuit has described how "in the context of apportionment of liability among coinsurers . . . a right of partial indemnification is implied by the court in order to avoid allowing one insurer a windfall in light of the existing insurance contracts."  *U.S. Fire Ins. Co.*, 858 F.2d at 887; *see id.* (citing New York caselaw providing "plaintiff insurer[s] a cause of action based on a theory of 'implied indemnification'").  The Circuit concluded that "[i]n the insurance context, therefore, where the insurance contracts reveal multiple coverage, the court exercises its equity powers to imply a contract between the coinsurers to contribute, and the proportion of their required contribution is grounded in the policy limits set forth in the contract of each insurer with the insured."  *Id.*  Thus, under an implied indemnification theory, courts look to the terms of the governing policy contracts to avoid an unjust enrichment.  *See*, *e.g.*, *W.R. Grace & Co.*, 218 F.3d at 212 (looking to "policy terms, coverage issues and defenses (as well as other contributing payments)" to assess the equities); *Goodpasture, Inc.*, 782 F.2d at 351 (describing the implied contract theory of indemnity as based on "the special nature of a contractual relationship between parties").

Importantly, such claims for payment between co-insurers do not sound in subrogation, "an equitable doctrine that allows an insurer to 'stand in the shoes' of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse," *Utica Mut. Ins. Co. v. Brooklyn Navy Yard Dev. Corp.*, 861 N.Y.S.2d 724, 726 (2d Dep't 2008), because the co-insurer is not a "third-party wrongdoer," *Maryland Cas. Co.*, 218 F.3d at 211; *see also Nat'l Cas. Co. v. Vigilant Ins. Co.*, 466 F. Supp. 2d 533, 541 (S.D.N.Y. 2006) (same).  Nor does such a claim for payment between co-insurers sound in a

"third-party beneficiary" claim—even in light of an "Other Insurance" provision in the co-insurers policy—in part because the plaintiff insurer is typically not "named in [the co-insurer's] policy, nor was it within a class of intended beneficiaries of the policy." *Id*. at 543. Finally, although such claims bear similar roots to contribution claims, *see supra*, claims between co-insurers do not sound precisely in contribution when they are not based on "ratable or proportional reimbursement." *McDermott*, 406 N.E.2d at 462; *see also Ins. Co. of N. Am. v. Historic Cohoes II*, 879 F. Supp. 222, 228 (N.D.N.Y. 1995) ("[Under] [c]ontribution . . . , the loss is distributed among the tortfeasors as they are required to pay their proportionate share of the loss. Common law indemnity, on the other hand, arises out of an implied-in-law contract, and the entire loss is shifted from one party to another to prevent an unjust or unsatisfactory result.").

### 3.      Section 3420(a)(5) and (d)(2)

Prior to the enactment of New York Insurance Law § 3420(a)(5), New York common law provided that "[a]bsent a valid excuse, a failure to satisfy the notice requirement vitiates the policy, and the insurer need not show prejudice before it can assert the defense of noncompliance." *Sec. Mut. Ins. Co. of N.Y.*, 293 N.E.2d at 78; *see also Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*, 421 Fed. App'x 5, 56 (2011) (same); *Abner, Herrman & Brock, Inc.*, 308 F. Supp. 2d 331, 337 (S.D.N.Y. 2004) (same).

Effective January 2009, however, New York Insurance Law § 3420(a)(5) required that any provision in an insurance contract providing that failure to give timely notice would be a basis for denial must also require the insurer to show prejudice from untimely notice. More specifically, Section 3420(a)(5) provides the following:

> (5) A provision that failure to give any notice required to be given by such policy within the time prescribed therein shall not invalidate any claim made *by the insured, injured person or any other claimant*, unless the failure to provide timely

notice has prejudiced the insurer except as provided in paragraph four of this subsection. . . . [6]

N.Y. Ins. L. § 3420(a)(5) (emphasis added).  This requirement, or something more favorable than it, is required for a contract insuring against personal injury or property damage "issued or delivered in this state."  N.Y. Ins. L. 3420(a).  "[W]hen § 3420 does not apply, the common law rule for insurance contracts is a no-prejudice rule."  *Travelers Prop. Cas. Co. of Am.*, 485 F. Supp. 3d at 406–07.

Section 3420(a)(5) only applies to claims from certain claimants of "the insured, injured person or any other claimant."  *Id.*  That phrasing of "by the insured, injured person or any other claimant" occurs in other parts of Section 3420, including Subsection 3420(d)(2), which states:

> If under a liability policy issued or delivered in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage *to the insured and the injured person or any other claimant*.

*Id*. § 3420(d)(2) (emphasis added).

Section 3420(d)(2) mandates that in order for a disclaimer of liability by an insurer to be valid, the insurer must provide notice of that disclaimer "as soon as is reasonably possible."  *See Bovis Lend Lease LMB, Inc. v. Royal Surplus Lines Ins. Co.*, 806 N.Y.S.2d 53, 58 (1st Dep't 2005); *see also Pearson Cap. Partners LLC v. James River Ins. Co.*, 151 F. Supp. 3d 392, 407 (S.D.N.Y. 2015) (same).  In *Bovis*, which addressed the scope of Section 3420(d)(2), the

---

[6] Subsection four reads:

> A provision that failure to give any notice required to be given by such policy within the time prescribed therein shall not invalidate any claim made by the insured, an injured person or any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible thereafter.

N.Y. Ins. L. § 3420(a)(4)

Appellate Division of the First Department answered the question of whether Section 3420(d)(2) protected one insurer who tendered the defense and indemnification of a mutual insured against the untimely disclaimer of coverage by the second insured.  After holding that Section 3420(d) protected the mutual insured against the untimely disclaimer, the court held that the section did not protect the insurer itself.  *Id*. at 58–60.  Analyzing both the language of the statute and its underlying legislative history, the court held that Section 3420(d)(2) required the "insurer [to] give prompt written notice of disclaimer of liability or denial of coverage not only to the insured but also to any party that has a *claim against the insured arising under the policy*."  *Id.* at 58 (citing *Hartford Acc. & Indemn. Co. v. J.J. Wicks*, Inc., 482 N.Y.S.2d 935 (4th Dep't 1984)) (emphasis in original).  The court made clear that the purpose of the provision was to protect the insured (and those similarly situated and suing under the policy).  It stated that "the notice requirement of § 3420(d) [wa]s designed to protect the insured and the injured person or other claimant against the risk, posed by a delay in learning the insurer's position, of expending energy and resources in an ultimately futile attempt to recover damages from an insurer or forgoing alternative methods for recovering damages until it is too late to pursue them."  *Id.* at 59.  The court then quoted the Bill Jacket for the law that ultimately became Section 3420(d);

> This bill would prevent insurance companies from deliberately engaging in dilatory practices which inhibit the fair and expeditious resolution of liability claims.  By expediting the disclaimer or denial process, the consumer is able to pursue, at an earlier point in time, an alternative method of recovering liability damages.

*Id*.  An insurer seeking contribution, however, was not subject to those risks and had the ability to protect itself against untimely notice of denial or disclaimer from a coinsurer.  *Id.* at 60.  It was well-established that Section 3420(d) did not apply to requests for contribution between coinsurers.  *Id.*  It followed logically that the law also would not be applicable to claims from an insurer due to the rejection of the tender by one insurer to another of full defense and indemnity.

*Id.* The insurer simply was not "within the zone of interest which the statutory requirement of notice to the injured parties seeks to protect." *Id.* (quoting *Batchie v. Travelers Ins. Co.*, 515 N.Y.S.2d 271, 272 (2d Dep't 1987)).

The First Department further "clarif[ied the] holding" of *Bovis* in *JT Magen v. Hartford Fire Insurance Company*, 879 N.Y.S.2d 100 (1st Dep't 2009). The plaintiff in *JT Magen* was the insured on behalf of whom its primary insurer tendered a notice of claim and request for defense and indemnification on behalf of their mutual insureds. *Id.* at 101. The court held that the defendant, who had agreed to provide additional insured coverage, was required to provide timely notice of disclaimer. *Id.* at 104–05. The court rejected defendant's argument that Section 3420(d)(2) was "inapplicable since the tender letter was from an insurer and the statute does not require a prompt response to claims asserted by other insurers." *Id.* at 104. Distinguishing *Bovis*, the court held that "unlike *Bovis*, where one of the plaintiffs seeking declaratory relief was an insurer, the only plaintiff in this action is JT Magen [the insured], which seeks a defense and indemnification from Hartford. Travelers has not asserted any claim against Hartford for monetary relief covering the costs it incurred in the underlying personal injury action." *Id.* In short, the First Department distinguished the application of § 3420(d)(2) when the insurer was suing for its own costs or on behalf of its insured. That assessment was further confirmed in *Greater New York Mutual Insurance Company v. Chubb Indemnity Insurance Company,* 963 N.Y.S.2d 218, 220 (1st Dep't 2013), which involved claims from the insured and an insurance company. There, the court held that while defendant insurer company was required to "defend and indemnify [plaintiffs] Parra and the garage in the underlying . . . action," plaintiff insurance firm was "not entitled to reimbursement of the amounts it has expended thus far" because there

was no obligation of prompt disclaimer to the plaintiff insurance firm and exclusions under the policy applied. *Id.*

### 4.   Application

Although Technology's policy is issued as primary, PIIC does not dispute that Technology's coverage is excess to that of PIIC.  Absent a valid basis to disclaim coverage, PIIC would be responsible for Hinde's loss and that responsibility would be primary to Technology. As a result, PIIC would be responsible in implied indemnification for all sums paid by Technology that would discharge the duty owed by PIIC to its insured.  *See* Dkt. No. 49 at 35.

Determining the "priority of coverage" requires "review and consider[ation of] the provisions of all of the relevant policies at issue to determine the priority among them," including an assessment of the "other insurance" clauses.  *Vill. of Brewster v. Virginia Sur. Co.*, 896 N.Y.S.2d 203, 207 (4th Dep't 2010).  "Where the same risk is covered by two or more policies, each of which was sold to provide the same level of coverage (as is the case here), priority of coverage (or, alternatively, allocation of coverage) among the policies is determined by comparison of their respective 'other insurance' clauses."  *Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading, PA*, 878 N.Y.S.2d 339, 343 (1st Dep't 2009).  Insurers have differing obligations depending on whether their coverage is excess or primary.  "Where one insurance policy is primary and one insurance policy is excess based on the 'other insurance' clauses, the 'primary insurer has the primary duty to defend on behalf of its insureds and it generally has no entitlement to contribution of an excess insurer.'"  *Liberty Mut. Ins. Corp. v. N.Y. Marine & Gen. Ins. Co.*, 505 F. Supp. 3d 260, 276 (S.D.N.Y. 2020) (quoting *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 945 N.E.2d 1013 (N.Y. 2011)).  Moreover, "[a]n excess carrier may, in its discretion, protect its interest . . . by participating in the defense . . . however, there is no

obligation to do so." *Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.*, 828 N.E.2d 959, 961 (N.Y. 2005) (internal quotation marks and citation omitted).

The PIIC Policy and the Technology Policy "Other Insurance" clauses provide, in substantially similar language, that "[t]his insurance is primary," but deems that the insurance shall be "excess over," *inter alia*, "[a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, *for which you have been added as an additional insured by attachment of an endorsement*." Dkt. No. 46-1 at ECF p. 264 (emphasis added); Dkt. No. 47-3 at ECF p. 16.[7] Technology points to the "General Liability Deluxe Endorsement: Human Services" from PIIC providing that "Managers, Landlords, or Lessors of Premises" are additional insureds under the PIIC Policy. *See* Dkt. No. 46-1 at ECF p. 314. That clause provides "additional insured" coverage of the incident involved here for Hinde. *See supra* Section I. PIIC points to no such endorsement from Technology. Therefore, the Tower Policy is excess to the PIIC Policy. PIIC had a primary duty to defend as a primary insurer with no entitlement to contribution from Technology. *See Liberty Mut. Ins. Corp.*, 505 F. Supp. 3d at 276. PIIC does not dispute that this would make it liable for all of the costs expended by Technology. Technology's claim sounds in implied indemnification, rather than contribution. *See McDermott*, 406 N.E.2d at 462.

There is no dispute in this case that AmTrust's notice was unreasonably delayed. Technology states in its briefing that "[a]dmittedly, Hinde, through AmTrust, did not notify PIIC

---

[7] Although PIIC points to a difference between the Tower Policy and the PIIC Policy in their Rule 56.1 Counterstatement, *see* Dkt. No. 65 ¶ 10, the Court does not see this revision in the Tower Policy as "creat[ing] an ambiguity as to TIC's excess argument in application of the PIIC Policy Deluxe Endorsement." *Id*. The revision simply stated that it would be excess over damages arising not simply out of the premises or operations, but also "products and completed operations"—a category of coverage which is immaterial here. *See* Dkt. No. 47-1 at ECF p. 20.

of the claim or suit until September 21, 2018, over three years after a claim letter was evidently mailed to Hinde relating to the Ramos incident and almost three years after Hinde was served with the Underlying Action summons and complaint." Dkt. No. 49 at 20; *see also* Dkt. No. 65 ¶ 31 (describing how Hinde was first served by the Claimant on October 27, 2015); *id.* ¶¶ 39, 41 (describing AmTrust's tender to PIIC on September 21, 2018 and PIIC's response denying the tender on October 4, 2018). Technology received the same late notice of suit but agreed to defend. An extended delay of nearly three years for notice is unreasonable as a matter of law. *See Tower Ins. Co. of N.Y.*, 115 N.Y.S.3d 613 (Table), 2019 WL 2202746 at *6 (providing that one to two months is unreasonable as a matter of law). The Court must then resolve whether PIIC needs to show prejudice from untimely notice of the suit from Technology (through AmTrust) and whether PIIC was indeed prejudiced.

Reasoning by analogy to Section 3420(d)(2), PIIC argues that if Technology does not fit within the category of "the insured and the injured person or any other claimant" entitled to timely disclaimer under Section 3420(d)(2), it also must fall outside the category of "insured, injured person or any other claimant" for whom an untimely notice will not invalidate a claim under Section 3420(a)(5) in the absence of prejudice. Dkt. No. 56 at 14–15. It argues from that proposition that the "no prejudice" rule under New York common law applies. Because the claim is made by Technology and not by Hinde, it argues that its obligations to Technology have been vitiated. Dkt. No. 56 at 14–16.

Neither party identifies a New York court that has addressed the issue. The Court independently has discovered no case that addresses the issue.[8] The issue apparently has never arisen, or been raised.

---

[8] The Court, however, notes that other courts have applied the prejudice requirement in insurer–

In the Court's judgment, PIIC misreads Section 3420(a)(5) and its applicability to Technology's implied indemnification claim against it. Section 3420(a)(5), by its terms, applies to policies and contracts between the insured and its insurer. It establishes the minimum baseline language that must be included in all policies and contracts issued or delivered in New York State. Neither Section 3420(a)(5) nor the PIIC Policy vitiate Technology's claim in the absence of prejudice. With prejudice, an unreasonable delay would relieve PIIC of its duty to Hinde and thereby release it of its obligation to Technology based on Technology's discharge of a duty owed by PIIC to Hinde. *See* Couch on Insurance Third Edition § 217:16 (2022) ("An insurer seeking indemnification in accordance with a provision in a contract between its insured and another party has no greater rights than are provided for in the contract."). In the absence of prejudice, the delayed notice would not vitiate Hinde's right to coverage from PIIC and therefore it cannot eliminate PIIC's liability to Technology for payments made by it that should rightfully have been made by PIIC. *See McDermott*, 46 N.E.2d at 462 ("a person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity." (internal citations and quotation marks omitted)). Neither the common law nor Section 3420(a)(5) hold an insurer seeking indemnification on an equitable basis to a more onerous standard regarding notice than that to which the insured itself is subject.

---

insurer disputes that involve recovery for the plaintiff insurer's past costs. *See, e.g.*, *Harleysville Worcester Ins. Co. v. Wesco Ins. Co., Inc.*, 314 F. Supp. 3d 534, 549 (S.D.N.Y. 2018), *aff'd sub nom. Harleysville Worcester Ins. Co. v. Wesco Ins. Co.*, 752 F. App'x 90 (2d Cir. 2019) (finding that plaintiff insurance company was entitled to reimbursement in full because of a lack of showing of prejudice); *Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*, 122 F. Supp. 3d 44, 55–57 (S.D.N.Y. 2015) (finding that defendant insurer had not demonstrated prejudice and was thus required to reimburse plaintiff insurer for past costs and interest).

The point can be readily illustrated.  An insured which is the beneficiary of its own policy—issued as a primary policy—and a policy on which it is also an additional insured, can make a claim on either policy or both.  It is not required to make a claim on the policy for which it is an additional insured.  *See Royal Ins. Co. of Am. d/b/a Royal & Sunalliance v. Com. Underwriters Ins. Co.*, 2004 WL 2609522, at *6 (S.D.N.Y. Nov. 17, 2004) ("Generally, if 'two policies potentially apply to a loss, an insured can elect which of its insurers should defend and indemnify the claim by tendering its defense to one insurer and not the other.'" (quoting 14 Couch on Insurance 3d § 200.40)).  If it provides notice of a claim to its own insurer, the insurer has a duty to pay on that claim even if—pursuant to an "other insurance" clause—some other policy might be primary to it.[9]  The insurer cannot decline coverage on the basis that, though its policy is primary, it is excess to some other primary policy nor, if it honors its insured's claim, can it recover from the additional insured the payments it has made pursuant to the insured's claim.  *See ELRAC, Inc. v. Ward*, 748 N.E.2d 1, 8 (N.Y. 2001) (providing for an antisubrogation rule that an "insurer has no right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered").  It is out of pocket.  Its remedy is to seek

---

[9] Indeed, the terms of the Technology Policy obligate Technology to cover the insured.  *See* Dkt. No. 47-3 at ECF p. 6 ("We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages."); *see also id.* at ECF p. 16 ("This insurance is primary except when Paragraph b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary."); *see also id.* ("When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any 'suit' if any other insurer has a duty to defend the insured against that 'suit.'  If no other insurer defends, *we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers*." (emphasis added)).  Technology confirmed as much during oral argument, stating that "[b]ecause unless that other coverage is in place and has been confirmed, as a primary insurer, you still have a duty to defend.  You can't say tough luck.  Your primary insurer has to step in and defend."  Dkt. No. 73.

implied indemnification from the other insurer.  The insured's own insurer has "discharged a duty that is owed by [them]," but is "entitled to indemnity" as the additional insurer is primary and thus the duty "should have been discharged by the [additional insurer]." *McDermott*, 406 N.E.2d at 462.

It follows then as a matter of logic that the defenses of the additional insurer against a claim of indemnification by the insured's own insurer cannot be any greater than its defenses against the insured.  The additional insurer can assert that the notice it received was late and caused it prejudice.  In that event, it cannot be said that the additional insurer should have paid the claim submitted by the insured.  That defense would vitiate coverage to the own insurer in implied indemnity.  The own insurer would not have discharged a duty owed by the additional insurer.  But the additional insurer cannot assert against the own insurer a defense it would not have against its insured or assert merely that the notice was late without any prejudice.  To do so would relieve it from liability it properly owes.  It would put the own insurer—which is a beneficiary of the other insured clause—between a rock and hard place.  The own insurer would have to pay its insured on the claim.  Assuming it was late but there was no prejudice, it would have no defense to that claim.  Nor, had the claim been made by the insured to the additional insurer, would the additional insurer have a defense.  But by the fortuity that the insured chose to claim against its own insurer first and not against the additional insurer, the own insurer would be forced to absorb a loss that does not belong to it.  Technology, as the own insurer, would be left holding the bag for Hinde's defense costs and indemnification, while PIIC (and all others similarly situated), which enjoyed no greater contractual rights vis-a-vis the insured (and which also agreed to be primary as between Technology and it), would enjoy a windfall, despite being the primary insurance and agreeing to defend and indemnify as an additional insured.  That

would constitute an "unjust enrichment" subject to implied indemnification.  *McDermott*, 406

N.E.2d at 462.

Inequitable and absurd outcomes would result from PIIC's reading out of the prejudice

requirement from the contract between the insured and insurer.  *See*, *e.g.*, *ACC Const. Corp. v.*

*Tower Ins. Co. of New York*, 921 N.Y.S.2d 218, 219 (1st Dep't 2011) (rejecting interpretation of

an indemnity provision in a settlement contract that would be "absurd" and "contrary to the

reasonable expectations of the parties").  It is not disputed that Hinde, if Technology had not

assumed the defense or if it had approached PIIC first or alone, would have been able to make a

claim on the PIIC Policy and that PIIC would not be relieved of its obligations under that policy

by virtue of any late notice.  The policy language, pursuant to Section 3520(a)(5), provides that

late notice relieves PIIC of its obligations only in the event of prejudice.  It also is not disputed

that PIIC's assumption of the defense and of its indemnification responsibilities would relieve

Technology of any responsibility to the insured up to PIIC's policy limits.  As already discussed,

PIIC's policy is primary to that of Technology.  It further is not disputed that if even today Hinde

made a claim on PIIC for defense costs and for indemnification, PIIC could not defend on the

grounds of late notice.  That defense would be precluded in the absence of prejudice.  It follows

necessarily that the fact that the claim is made by Technology, including with respect to the

funds it has already advanced but as to which PIIC has primary responsibility, should not relieve

PIIC of its obligations as the primary insurer.  To hold otherwise would require the named

insurer (Technology) to decline a claim for insurance within the policy limits in a manner

contrary to its contractual obligations and require its insured (Hinde) to go in the first instance to

the co-insurer (PIIC) at the risk, if insured does not do so, that the co-insurer will assert late

notice as a defense to the implied indemnification claim from the named insurer.  *Cf.*

*Goodpasture, Inc.*, 782 F.2d at 351 (finding that there was "nothing special" about "ordinary commodities contracts" from which "an agreement indemnify could 'fairly be implied'").

The language of Section 3420(a)(5) thus does not, by negative implication, deprive Technology of recovery here.  That language refers to invalidating claims "made by the insured, injured person or any other claimant" because those are the persons who can make claims under the insurance policy or contract.  Such claims would be barred by late notice in the absence of contract language explicitly protecting them.  But Technology does not make its claim under the PIIC policy.  It makes its claim under equitable principles based on PIIC's duty to Hinde under the policy.  Therefore, no inference can be drawn from the fact that the legislature did not include co-insurers among the persons required to be protected from late notice in the contract language because the co-insurers here do not sue directly under the contract.  The statute is not addressed to the notice an insurer must provide.  *Cf. Bovis*, 806 N.Y.S.2d at 59.  Here, Technology sues under equitable principles that require co-insurers of the same risk to assume responsibility (under an implied indemnification theory) or share responsibility (under an equitable contribution theory) if the requirements for them to assume that risk have been triggered.[10]

---

[10] PIIC made one final point at oral argument.  It argued that Section 3420(c)(2)(a) of the New York Insurance Law demonstrated that the prejudice requirement does not apply to claims between insurers.  That provision places the burden to show prejudice on the insurer when notice was within two years of the time required under the policy and the burden on the insured if notice is made after two years.  It does not account for the circumstance in which the insured is not a party and thus cannot assume the burden.  From that premise, PIIC would draw the conclusion that the prejudice requirement does not apply to inter-insurer disputes—there is no insured to shoulder the burden with respect to notice that is over two years late.
The conundrum is easily addressed.  As noted, Section 3420 applies to claims under a policy and not to claims for implied indemnification or contribution.  With respect to the later set of claims, the party seeking to establish the existence of an implied contract of indemnification typically bears the burden of doing so.  *See, e.g.*, *City of N.Y. v. Black & Veatch*, 1997 WL 624985, at *10 (S.D.N.Y. Oct. 6, 1997).  Section 3420(c)(2)(a) need not have accounted for the placement of the

The Court also concludes that PIIC was not prejudiced by any delay.  Even if Hinde had provided timely notice, PIIC would not have defended it based on the belief that Hinde would not have qualified for additional-insured coverage.  Dkt. No. 65 ¶ 42 (PIIC's Response to Technology's Statement of Undisputed Facts).  PIIC's first letter disclaimed coverage based on the assertion that the loss did not fall within the PIIC policy.  It asserted:

> Review of the lease that you provided addresses sidewalks, the lease indicates that Puerto Rican Family Foundation must keep the sidewalk free of snow and debris with no mention of cellar doors and it is not part of our insured's lease agreement, thus there is no trigger of any additional insured or contractual indemnification coverage.

Dkt. No. 56-22.  In other words, PIIC concluded that there was no claim under its policy because the cellar doors "is not part of our insured's lease agreement."  But, as PIIC admitted at argument, it would have asserted the identical disclaimer had it received notice at the time of the loss.  The late notice did not prejudice it in its ability to investigate, to take a reserve, to make an early settlement offer, or to participate in the defense or a settlement.  PIIC at oral argument stated that it "would have refused" due to Hinde's "lack of insured status" and that it would not have done any investigation at all.  Dkt. No. 73.  PIIC "cannot show prejudice because it denied coverage altogether . . . earlier notice would have resulted only in an earlier denial."  *Peerless Ins. Co. v. Tech. Ins. Co., Inc.*, 829 F. App'x 549, 552 (2d Cir. 2020) (summary order).

Indeed, PIIC's representative, Cruz, admitted to precisely that point.  Asked the question, "Would it be fair to say that even if late notice had not been an issue that you would have denied the tender based on a lack of trigger for the additional coverage for the reasons you gave in your response?," she answered with a definitive and unqualified "Yes."  *See* Dkt. No. 46-3 at 87–89.

---

burden in cases of inter-insurer disputes.  The common law addresses the burden and places it squarely on the plaintiff to show that the loss fell within the policy, including that if the notice was late there was also no prejudice that would vitiate coverage.

While PIIC claims that Cruz stated that she "did not recall" and argues that Technology "mischaracterizes Ms. Cruz's testimony," Dkt. No. 65 at 21, Cruz specifically recalled the additional insured clause, id. at 88, and confirmed that it was "[her] understanding of the additional insured lessor's provision that's in th[e] policy that if the condition that allegedly caused the accident was the responsibility of the landlord as opposed to [the] named insured . . . that would suffice to conclude there was no trigger of additional insured coverage," id. at 89. PIIC itself admits this in its briefing through its "acknowledgement that it would not have defended Hinde even if it timely reported the claim." Dkt. No. 64 at 10.

PIIC complains that Technology waived its late notice defense only because it reached an agreement with Claimant to waive certain defenses including that of late notice and that Technology settled without its participation. But neither argument provides a defense to Technology's claim for implied indemnification. There is nothing unfair to PIIC in Technology's agreement not to raise a late notice defense on behalf of itself. Technology had issued a primary policy and was responsible for the first dollar of Hinde's losses in the absence of a successful claim for implied indemnification. It had a legitimate interest in reaching an agreement to protect its own interests. And if the stipulation would have eliminated the prejudice to Technology from the late notice and permitted it to honor its obligations to the insured, that would have been consistent generally with the duties an insurer owes to its insured. Significantly, that agreement did not affect PIIC's rights. To the extent PIIC would have had a claim of prejudice based on late notice of the occurrence or claim, the vacatur of the default judgment would not have affected that prejudice. Also, that assertion always would have been challenging in light of PIIC's notice (through PRFI) of the underlying occurrence and claim and it lacks merit because PIIC would have denied coverage anyway on the basis that the cellar doors

were not covered under the PIIC Policy.  And if the only prejudice PIIC would have suffered from lack of notice of the lawsuit was that a default judgment was entered (and not any other prejudice) and if the vacatur vitiates that claim of prejudice and therefore requires PIIC (and not Technology), to defend and indemnify its additional insured, that is an obligation PIIC knowingly took on.  It cannot complain if it is forced to cover a loss because the late notice did not cause it prejudice.

And, as to the settlement, PIIC had a right to object to that settlement.  Technology specifically informed PIIC of the settlement and invited its objections.  Dkt. No. 56 ¶ 53.  It also "invite[d] PIIC to participate in further settlement discussions with Ramos's counsel."  *Id*.  It did so after it had retendered to PIIC and after PIIC had been informed that the default judgment upon which PIIC had relied for its prejudice argument had been vacated.  That is, it did so with the intent that if PIIC declined to participate and if it had to absorb the full amount of the settlement in the interest of its insured, it would seek indemnification from PIIC for its loss.  And PIIC, knowing those facts and knowing that Technology had tendered the loss to it, nonetheless "disclaim[ed] coverage for the Edwin Ramos matter and t[ook] no position with respect to the settlement."  *Id*. ¶ 54.  In doing so, it gave up the right to participate in settlement discussions and to object to the settlement.  *See Cardinal v. State*, 107 N.E.2d 569, 573 (N.Y. 1952) ("If an insurer unjustifiably refuses to defend a suit, the insured may make a reasonable settlement or compromise of the injured person's claim, and is then entitled to reimbursement from the insurer, even though the policy purports to avoid liability for settlements made without the insurer's consent."); 31 N.Y. Prac., N.Y. Ins. L. § 31:50 (21st ed. 2020) ("An insurer's wrongful refusal to defend causes the insurer to forfeit its right to control the underlying litigation, including the right to prohibit settlement or compromise by the insured, although the insured must still act

48

reasonably in this regard."); *see also Scottsdale Ins. Co. v. McGrath*, 549 F. Supp. 3d 334, 348 (S.D.N.Y. 2021). In other words, PIIC elected not to assume coverage, knowing that as a result it would be liable for a reasonable settlement if a court disagreed with its position and found it was liable for implied indemnification. Having made that election, it cannot now complain if the Court agrees instead with Technology and finds that it is liable for implied indemnification.

## III.   Whether Technology Has Standing

Finally, PIIC argues that Technology lacks standing to seek reimbursement of sums paid by AmTrust on the theory that Technology was not obligated to pay under the Cut-Through Endorsement under the Tower Policy. As a reminder, the Cut-Through Endorsement provides that Technology is obligated to pay "[i]n the event that the Company is declared insolvent by a court of competent jurisdiction and is unable to pay loss(es) under the Policy occurring on or after the Effective Date of this Endorsement (a 'Covered Loss')." Dkt. No. 65 ¶ 11. In that event, Technology as reinsurer "will be liable to the Insured for such Covered Loss and will make payment directly to the Insured, subject to the terms, limitations and conditions contained in the Policy." *Id.* PIIC argues that Technology was not obligated to pay losses under the Cut-Through Endorsement and that it did not pay directly to the Insured. The arguments are without merit.

PIIC first misconstrues the nature of the Cut-Through Endorsement. The Cut-Through Endorsement only applies to first-party property losses, in which the losses are payable "directly to the insured." Dkt. No. 56-33. Here, the liability claim involves payments to third parties (*e.g.*, through settlement and payment of defense fees and expenses), and not payment directly to the insured. That obligation arises from the Conservation Agreement and the Reinsurance

Agreement.  Therefore, PIIC's standing argument based on the express terms of the Cut-Through Agreement does not address Technology's claim, which is not based on that agreement. [11]

Technology's obligations for third-party claims are instead governed by two separate agreements—the Conservation Agreement and the Reinsurance Agreement.  The Reinsurance Agreement reinsured obligations from the Tower Policy, ceded by Tower and assumed by Technology as a reinsurer.  Dkt. No. 65 ¶ 13.  Under the Conservation Agreement—entered into before the Liquidation Order—Castlepoint assigned to Technology "as its direct obligation to the applicable policyholders or other obligees of [CastlePoint], all of the liabilities of [CastlePoint] reinsured under [the Reinsurance Agreement]."  Dkt. No. 65 ¶ 16; Dkt. No. 47-7 § 9.1.11(a)(i). It then stated that Technology "shall become a direct obligor with respect to the insurance thereunder."  Dkt. No. 47-7 § 9.1.11(a)(ii).  The Conservation Agreement thus effectively merged Tower into CastlePoint and transformed those reinsurance liabilities into direct obligations of Technology.  Following the Conservation Agreement, the obligations under the Reinsurance Agreement were obligations of Technology and not subject to the Liquidation Order.  *See also* Dkt. No. 47 ¶ 7 (Aptman declaration providing the same assessment that "those policies issued by Tower that were reinsured by Technology under the Reinsurance Agreement, such as the Tower Policy, are not subject to the Liquidation Order or thus the Commissioner's

---

[11] Even if the Cut-Through Agreement did apply here, the Court finds that Tower was declared insolvent by a court of competent jurisdiction.  By order dated March 30, 2017, the Superior Court of the State of California found CastlePoint to be insolvent and liquidated.  Dkt. No. 17 ¶ 17; *see also* Dkt. No. 47-8 (liquidation order).  That liquidation included the assets of Tower, "including any and all assets held in the names of any company that is a predecessor by merger with CastlePoint."  Dkt. No. 47-8 ¶ 5; *see id.* ¶ 5 n.1 (the Liquidation order providing that Tower was part of the entity of Castlepoint).  Furthermore, after the Conservation and Reinsurance Agreements and while it was in liquidation, CastlePoint would have been unable to pay for the loss as Technology—not it—became the direct obligor with respect to third-party claims.  There was no need to ask CastlePoint (or Tower) for what the documents make clear: CastlePoint can pay only its own obligations and not those of a third party.

control").  There was no authority under the Liquidation Agreement for the Liquidator or the

Commissioner to satisfy obligations that did not rest with CastlePoint.

Finally, the Court rejects PIIC's argument that Technology is not entitled to

reimbursement for failure of proof of a check or wire being sent directly from Technology.  The

evidence before the Court establishes that the defense costs paid by Technology emanated from a

fund maintained by its managing general agent, AmTrust, but funded by Technology.  *See*, *e.g.*,

Dkt. No. 63-2 at 54 (Q: ". . . and did TIC pay any loss in the Ramos Claim?"  A: "Yes."); *id*.

(stating that it paid "$88,000" as well as "expense payments made to various third parties"); *id*.

at 55 (Q: "Did TIC make the decision to settle the Ramos claim?"  A: "Again, because TIC has

and had no employees, and AmTrust was acting as its general managing agent, AmTrust made

the decision."  Q: "Was there a written agreement between TIC and AmTrust to handle all of the

claims for TIC as a reinsurer?"  A: "Yes."); *see also* Dkt. No. 47 ¶ 9 ("Consistent with

AmTrust's role as Technology's general managing agent, the bank account through which

Technology made expense and claim payments under any policy issued by Tower it reinsured

under the Reinsurance Agreement, including the Tower Policy, was held in the name of and

administered by AmTrust but funded by Technology.").

It is of no moment that Technology handled its payment obligations by having them

discharged by its managing general agent.  For that matter, it would be of no moment had

Technology chosen to pay in cash and had that cash delivered by an agent.  "A managing general

agent . . . is a third party appointed by an insurance company that is given broad authority to

underwrite and administer risk, whether direct insurance policies or reinsurance, on behalf of the

insurance company."  4C N.Y. Prac., Com. Litig. in New York State Courts § 91:14 (5th ed.).

As a matter of law, AmTrust would have no right to sue to recover a payment made on behalf of

its principal.  *See*, *e.g.*, *Horn v. Toback*, 989 N.Y.S.2d 779, 782 (2d Dep't 2014).  The claim

resides with the principal.  It follows as a corollary that the principal has standing to sue even

though the payment was delivered by the agent.  *See*, *e.g.*, *Ivory Dev., LLC v. Roe*, 25 N.Y.S.3d

686, 690 (3d Dep't 2016) ("Although a corporation does not generally have standing to exercise

the legal rights of another corporation, even when the entities are affiliated through their

ownership or management, a principal may sue on claims arising from actions taken by its agent.

Plaintiffs' affidavit, in effect, alleged that Black Creek acted as plaintiffs' agent in making the

payments to Roe.  Thus, plaintiffs' first cause of action should not have been dismissed."

(internal citations omitted)); *see also IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F.

Supp. 2d 363, 375 (S.D.N.Y. 2010) ("As principal, the Zohar Funds have standing to sue on the

License Agreement, because a principal can sue on a contract entered into by his agent on his

behalf.").[12]  Because the payment was made pursuant to Technology's obligations and because it

was funded by Technology, it is Technology and not AmTrust that has the claim.

---

[12] PIIC's other contentions on this point are without merit.  Although PIIC asserts that
representative of AmTrust, Glenn Denzler, did not know who the payor was for the Claim when
asked at deposition, *see* Dkt. No. 56-31 at 54, PIIC does not explain why that eliminates any
such agency relationship or diminishes the capacity of AmTrust to act as Technology's agent.
Instead, "where one knowingly and without dissent permits another to act as such person's agent,
the capacity of the latter will be conclusively presumed."  2A N.Y. Jur. 2d Agency § 16.
Moreover, PIIC asserts that Technology had no employees.  *See* ECF 56-32 at 19.  But there is
no requirement that a corporation—a distinct legal entity that by definition does not have a
"corporeal being"—must also have individual employees in order to exist and have standing.

**CONCLUSION**

PIIC's motion for summary judgment is DENIED.  Technology's motion for summary

judgment is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 43 and 44.


SO ORDERED.


Dated: November 23, 2022
      New York, New York                                   LEWIS J. LIMAN
                                         United States District Judge